## S11A0153. ALMODOVAR v. THE STATE.
### (713 SE2d 373)

NAHMIAS, Justice.

Jaime Almodovar challenges his 2005 convictions for murder and other crimes in connection with the shooting deaths of Felix Osorio and Carlos Rebollar. We affirm.[1]

1. The evidence at trial, viewed in the light most favorable to the verdict, showed the following. On the afternoon of August 16, 2003,

---

[1] The victims were killed on August 16, 2003. On December 3, 2003, Almodovar was indicted on two counts of malice murder, two counts of felony murder, and two counts of aggravated assault, plus six counts of possession of a firearm during commission of a felony. On May 11, 2005, the jury convicted Almodovar on all charges after an eight-day trial. The trial court sentenced him to consecutive terms of life in prison for the malice murders and a total of ten years consecutive for the firearms convictions. The two aggravated assault convictions and four of the six firearms convictions merged, and the felony murder convictions were vacated. On June 7, 2005, Almodovar filed a motion for new trial, which he later amended. Following a May 15, 2009 hearing, the trial court denied the motion on July 7, 2009. After Almodovar filed a timely notice of appeal, the case was docketed in this Court for the January 2011 term and orally argued on January 25, 2011.

Almodovar drove the two victims in his Pathfinder SUV to a friend's home in Athens, Georgia. Witnesses saw the men standing around talking and drinking in the driveway before Almodovar, with no evident provocation, drew a handgun and shot both victims at point blank range several times in the head, killing them. The victims were unarmed and extremely intoxicated. Almodovar also shot at a fleeing witness but missed. Almodovar sped away in the Pathfinder, nearly running a couple in a car off the road. One of the people in the car contacted 911 and provided a description and partial tag number for the vehicle, which police later recovered and linked to Almodovar.

A few weeks later, Special Agent Francisco Hidalgo of the Florida Department of Law Enforcement got a tip from a confidential source that a man wanted for homicide in Athens, Georgia was hiding in the Orlando, Florida area. Agent Hidalgo contacted the Athens-Clarke County Police Department, which told him about the murders of Osorio and Rebollar, and he confirmed that an arrest warrant had been issued for Almodovar. Agent Hidalgo traced the telephone number his source had been using to communicate with Almodovar to a residential address in the Orlando area, where a team of officers arrested Almodovar on September 6, 2003.

Almodovar was taken to a nearby police station, where he confessed to killing the victims but claimed that he acted in self-defense because one of the victims had said that he would kill Almodovar. Almodovar presented the same defense at trial through his statements to the Florida officers and witness testimony that one victim had threatened to kill Almodovar earlier on the day of the shootings.

When viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find the defendant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SC 2781, 61 LE2d 560) (1979). "While [the defendant] offered a significantly different account of the events than the State, '"(i)t was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence,"'" including the evidence relating to Almodovar's defense of justification. *Avila v. State*, 289 Ga. 409, 410-411 (711 SE2d 706) (2011) (citations omitted).

2. Almodovar contends that the trial court erred in admitting his statements to the Florida officers because the State failed to show that they were freely and voluntarily made. We disagree.

Just after midnight on September 6, 2003, Agent Hidalgo and four other law enforcement officers went to the trailer where Almodovar was thought to be staying. Two marked police vehicles with their lights flashing were stationed in front of the residence.

Agent Hidalgo and two other officers went to the front of the trailer while the other two officers went around back to prevent anyone from escaping. Agent Hidalgo knocked on the front door and announced who he was, and two people eventually came to the door. Agent Hidalgo asked them where "Jaime" was, but they denied knowing his whereabouts. At the same time, a Hispanic man opened the back door to the trailer but then closed it and retreated inside after an officer shined a flashlight in his face and ordered the man, in English, to show his hands. As soon as they heard an officer in back yell that someone was attempting to flee, Agent Hidalgo and the other officers at the front door entered the trailer. They found Almodovar in a back bedroom, where Agent Hidalgo spoke with Almodovar in Spanish, Almodovar's native language. After confirming Almodovar's name, the officers placed him under arrest, handcuffed him, and placed him in the front passenger seat of one of the police cars out front.

Almodovar was not wearing a shirt or shoes and appeared to be cold. Agent Hidalgo asked if he was okay, and Almodovar said he was cold and his handcuffs were too tight. Almodovar then looked down, and Agent Hidalgo asked him again if he was okay. Almodovar said that he would like to clear his name. Agent Hidalgo asked if Almodovar was saying that he wanted to talk, and he said yes. Agent Hidalgo told Almodovar that he was about to be transported to the police station and told another officer to retrieve Almodovar's shirt and shoes from the trailer, which was done. Agent Hidalgo then followed Almodovar to the station, which was 20 minutes away.

Almodovar was placed in an interrogation room. Agent Hidalgo and his partner entered the room, sat down at a table with Almodovar, and set up a recording device. Agent Hidalgo read Almodovar his *Miranda* rights in Spanish and also told him that he had a right to consult with the Mexican consulate if he wished. Almodovar again said that he wanted to talk and wanted to clear his name, and he then discussed the shootings with the officers. According to both agents, Almodovar did not appear to be under the influence of drugs or alcohol and appeared to understand what was being said, and Agent Hidalgo had no trouble understanding Almodovar's responses in Spanish. No threats, promises, or offers of benefit were made to Almodovar, and although he declined to sign a written waiver of his *Miranda* rights, he never asked any questions about his rights, asked to speak with counsel, or said that he wanted to stop talking. To the contrary, Almodovar said both before and after being advised of his rights that he wanted to talk to the police and clear his name.

Under these circumstances, the trial court did not err in concluding that Almodovar's statements were made freely and voluntarily. See, e.g., *Krause v. State*, 286 Ga. 745, 751 (691 SE2d

211) (2010) (affirming the denial of a motion to suppress because there was evidence that the defendant "did not appear to be under the influence of any intoxicants, appeared to be speaking freely and voluntarily, and was responsive to all questions" (citation omitted)). The court also properly rejected Almodovar's claim of a *Miranda* violation. See *Berghuis v. Thompkins*, ___ U. S. ___, ___ (130 SC 2250, 2262, 176 LE2d 1098) (2010) ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.").

3. Almodovar contends that his statements to the officers in Florida should have been excluded because they derived from an illegal arrest, relying on *Brown v. Illinois*, 422 U. S. 590 (95 SC 2254, 45 LE2d 416) (1975). In *Brown*, the police broke into the defendant's apartment, searched it, and then arrested him, all without a warrant or probable cause. See id. at 592. After being taken to a police station and being advised of his *Miranda* rights, the defendant made incriminating statements. See id. at 594. The Court rejected the argument that the defendant's statements were admissible despite his obviously illegal arrest because advising a defendant in custody of his *Miranda* rights automatically dissipates the taint of an illegal arrest. See id. at 604.

The State contends that Almodovar waived his *Brown* claim by not raising it properly in the trial court until his motion for new trial. Pretermitting the waiver issue, it is clear that *Brown* does not apply where, as here, the defendant was lawfully arrested pursuant to a warrant. See *Steagald v. United States*, 451 U. S. 204, 221 (101 SC 1642, 68 LE2d 38) (1981) ("[A]n arrest warrant alone will suffice to enter a suspect's own residence to effect his arrest."). Moreover, even when the police do not have a warrant, *Brown* does not apply where, as here, the arrest was supported by probable cause and the defendant's statements were taken outside his home. See *New York v. Harris*, 495 U. S. 14, 21 (110 SC 1640, 109 LE2d 13) (1990) ("We hold that, where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton* [*v. New York*, 445 U. S. 573 (100 SC 1371, 63 LE2d 639) (1980)]."); *Stinski v. State*, 281 Ga. 783, 785 (642 SE2d 1) (2007) ("Even where an arrest is unlawfully made inside a residence without a warrant, a subsequent statement made *outside* the residence need not be suppressed on Federal constitutional grounds." (emphasis in original)).

Thus, the trial court did not violate *Brown* by admitting Almodovar's statements to the Florida officers. It follows that Almodo-

var's remaining enumerations of error — that the court should have charged the jury on *Brown* sua sponte and that Almodovar's trial counsel was constitutionally inadequate for failing to request such a charge — are without merit.

*Judgment affirmed. All the Justices concur.*

DECIDED JULY 5, 2011.

*James D. Crowe*, for appellant.

*Kenneth W. Mauldin, District Attorney, Brian V. Patterson, David A. Zisook, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.